[No. 61178-5.   En Banc.   November 2, 1995.]

LIBBY COVELL, ET AL., *Appellants*, v. THE CITY OF SEATTLE, *Respondent*.

*Stoel, Rives, Boley, Jones & Grey*, by *William C. Severson*, for appellants.

*Mark H. Sidran, City Attorney*, and *Sandra L. Cohen* and *Arlene S. Ragozin, Assistants*, for respondent.

*Eric R. Hultman; Hugh D. Spitzer; Elizabeth Thomas*; and *Eric D. Lowney*, amici curiae.

MADSEN, J. — Libby Covell and John Backus, individually and as representatives of the class of persons similarly situated, appeal from a judgment upholding the City of Seattle's residential street utility charge. The principal issue is whether this charge is an unconstitutionally imposed property tax.

The statutory authority for the residential street utility charge is RCW 82.80.040. This statute authorizes every city and town to

> elect by action of its legislative authority to own, construct, maintain, operate, and preserve all or any described portion of its streets as a separate enterprise and facility, known as a street utility, and from time to time add other existing or new streets to that street utility, with full power to own, construct, maintain, operate, and preserve such streets.

RCW 82.80.040.

Any city or town electing to establish a street utility "may levy periodic charges for the use or availability of the streets in a total annual amount of up to fifty percent of the actual costs for maintenance, operation, and preservation of facilities under the jurisdiction of the street utility." RCW 82.80.050. Charges imposed on businesses are to be measured by the number of employees, while charges

imposed on owners or occupants of residential property are to be measured by the number of housing units. The residential charge shall not exceed two dollars per month per housing unit. RCW 82.80.050.

The proceeds collected pursuant to this statute may be used for "transportation purposes only," including operation and preservation of streets and other transportation improvements, construction and expansion of streets and improvements, and development and implementation of public transit systems. RCW 82.80.070(1).

Pursuant to this enactment, the City of Seattle passed an ordinance establishing a street utility in 1992. The ordinance calls for the collection of a street utility charge for the use or availability of the streets. Seattle Municipal Code (SMC) § 21.100.030. A second ordinance sets the residential charge at $2 per month per housing unit for single-family residences and $1.35 per month per housing unit for multiple-family residences. SMC § 21.101.020. The ordinance also provides that the residential street utility charge may be included in the annual King County property tax statement. SMC § 21.101.070.

On June 8, 1993, Libby Covell and John Backus filed this class action seeking a declaratory judgment invalidating the City's residential street utility charge. They challenged the constitutionality of the charges and sought a refund thereof, an injunction against the further collection of charges, and attorney fees. The trial court entered an agreed order certifying the class of all residential property owners who have paid or are paying the City's residential street utility charge.

Both sides moved for summary judgment. The trial court upheld the street utility charge and granted the City's motion, thus dismissing the complaint. The residential property owners, hereafter referred to as the Appellants, then sought direct review, which this court granted pursuant to RAP 4.2(a). We find two issues dispositive.

I

■ Appellants argue that the street utility charge is an

unconstitutional property tax which violates the uniformity requirement of Wash. Const. art. VII, § 1. That article provides that "[a]ll taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax. . . . All real estate shall constitute one class . . . ." Tax uniformity requires both an equal tax rate and equality in valuing the property taxed. *Boeing Co. v. King County*, 75 Wn.2d 160, 165, 449 P.2d 404 (1969).

The City concedes that the charges would be unconstitutional if they were property taxes, since they are not imposed in a uniform manner based on the value of property. As the street utility is now configured, the tax rate on a $60,000 house is forty times higher than the rate on a $2,400,000 mansion. The City maintains, however, that the charges are not taxes but utility charges or regulatory fees imposed pursuant to the City's police powers. The City argues that the charges also can be characterized as special assessments or excise taxes.

■ We turn first to the question of whether the street utility charge is a regulatory fee.[1] Governments may impose regulatory fees under their general police powers. *Margola Assocs. v. Seattle*, 121 Wn.2d 625, 634-35, 854 P.2d 23 (1993); Wash. Const. art. XI, § 11. This court has recognized that these police powers are extensive.

> Municipal police power is as extensive as that of the legislature, so long as the subject matter is local and the regulation does not conflict with general laws. . . . The scope of police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people.

*Hillis Homes, Inc. v. Snohomish County*, 97 Wn.2d 804,

---

[1]While the City attempts to distinguish between utility charges and regulatory fees, we see no real distinction between these entities in its analysis. In fact, the City acknowledges that mandatory utility charges, such as garbage and sewer charges, may be regarded as regulatory fees. *See Teter v. Clark County*, 104 Wn.2d 227, 239, 704 P.2d 1171 (1985); *see also Hillis Homes v. Public Util. Dist. 1*, 105 Wn.2d 288, 299, 714 P.2d 1163 (1986) (*Hillis Homes* II). For the sake of clarity, we will analyze this as a question of whether the street utility charge constitutes a regulatory fee or a tax.

808, 650 P.2d 193 (1982) (*Hillis Homes* I) (quoting *State v. Seattle*, 94 Wn.2d 162, 165, 615 P.2d 461 (1980)). On the other hand, local governments may tax only pursuant to specific legislative or constitutional authority. *Margola*, 121 Wn.2d at 634; *Hillis Homes* I, 97 Wn.2d at 809.

▮ Whether a charge imposed by a governmental entity is a tax or a regulatory fee depends upon three factors which have been identified in prior cases of this court. The first factor to consider, as set forth in *Hillis Homes* I, is "whether the primary purpose of the county [or city] is to accomplish desired public benefits which cost money, or whether the primary purpose is to regulate . . . ." *Id.* at 809 (quoting *Haugen v. Gleason*, 226 Or. 99, 104, 359 P.2d 108 (1961)). If the primary purpose of the charges is to raise revenue, rather than to regulate, then the charges are a tax. *Id.* at 810. Conversely, if the primary purpose is regulatory, "the charges are properly characterized as 'tools of regulation,' rather than taxes." *Teter v. Clark County*, 104 Wn.2d 227, 239, 704 P.2d 1171 (1985). The second factor which this court considers is whether the money collected must be allocated only to the authorized regulatory purpose. *See Hillis Homes, Inc. v. Public Util. Dist. 1*, 105 Wn.2d 288, 300, 714 P.2d 1163 (1986) (*Hillis Homes* II); *Teter*, 104 Wn.2d at 233-34. The last inquiry is whether there is a direct relationship between the fee charged and the service received by those who pay the fee or between the fee charged and the burden produced by the fee payer. *Id.* at 232; *see also Hillis Homes* II, 105 Wn.2d at 301. Where such a relationship exists, then the charge may be deemed a regulatory fee even though the charge is not individualized according to the benefit accruing to each fee payer or the burden produced by the fee payer. *Id.* at 301.

Appellants contend that the charges imposed here must be regarded as taxes when examined under the analysis set forth in our cases from which each of the factors above derive. We will begin, therefore, by examining the relevant case law to determine whether the street utility

charges constitute an exercise of the City's police power to impose regulatory fees or its statutory authority to tax.

Turning first to *Hillis Homes* I, Appellants argue that, like the development fees imposed in that case, the primary purpose of the utility fees here is to "accomplish desired public benefits which cost money . . ." and not to regulate any activity or entity. *Hillis Homes* I, 97 Wn.2d at 809 (quoting *Haugen v. Gleason*, 226 Or. 99, 104, 359 P.2d 108 (1961)). At issue in *Hillis Homes* I was the validity of county ordinances imposing charges on new subdivisions to pay for services such as parks, schools, roads, and fire protection. *Id.* at 806. The fees collected were to be deposited into special accounts and their use restricted to improvements that would benefit the geographic area from which payment was made. The court held that although the payments were characterized as fees, the terms of the ordinances clearly provided that the fees were to be applied to offset the cost of providing specified services and made no provision for the regulation of residential developments. *Id.* at 810. Thus, the court concluded that the fees were actually taxes, since their primary purpose was to raise money rather than regulate subdivisions. Since the Legislature had not authorized such a tax, it was invalid. *Id.* at 810.

We agree that there are strong similarities between the taxes imposed in *Hillis Homes* I and the street utility charges under challenge here. Although there is language in the ordinances requiring the adoption of a transportation plan along with a funding plan, most of the regulatory language is devoted to fiscal planning rather than toward the type of service or benefit for those who pay fees. One commentary demonstrates this emphasis in citing a key advantage of street utilities: "A street utility provides a reliable and predictable source of funding for planning purposes and for the repayment of loans used to pay for up-front costs of major construction and maintenance programs." Municipal Research & Services Center, *The Washington State Street Utility Legislation* at 4 (1992).

The ordinance language with regard to street improvement and maintenance is of an extremely general nature, and the thrust of the legislation is clearly on funding. Seattle's street utility ordinances make no attempt to regulate residential housing or even to regulate the use of city streets by residential occupants. Here, as in *Hillis Homes* I, the purported regulations do not apply at all to the entity or activity being assessed.

The City argues, however, that this court has set forth a very broad definition of "regulatory scheme" that includes charges based on a general statutory authority to control use and price of a service. Under this broad standard, the City contends that the street utility charge is a regulatory fee. In support, the City turns to *Teter v. Clark County*, 104 Wn.2d 227, 704 P.2d 1171 (1985). In that case the affected property owners maintained that, because their properties did not receive any special benefit from the regulatory actions, the charges constituted an unconstitutional property tax. *Id.* at 228.

This court found legislative intent to give counties the police power to operate management systems for storm sewers in the authorizing legislation. *Id.* at 232. The authorizing statute provided that "[t]he storm water control facilities within such county provide protection from storm water damage for life and property . . . and affect the prosperity, interests and welfare of all the residents of such county." RCW 36.89.020. A county resolution passed pursuant to RCW 36.89 stated that the basin "constitutes a potential hazard to lives and property." *Teter*, 104 Wn.2d at 233.

This court then observed that the police power is broad enough to encompass all laws tending to promote the health, peace, morals, education, good order and welfare of the people. *Teter*, 104 Wn.2d at 233 (citing *Markham Advertising Co. v. State*, 73 Wn.2d 405, 421-22, 439 P.2d 248 (1968), *appeal dismissed*, 393 U.S. 316 (1969)). "The cleanup by respondents of Burnt Bridge Creek and Lake Vancouver, along with measures to prevent flooding in

the entire drainage basin, are well within the definition of police power as health, safety or welfare measures." *Teter*, 104 Wn.2d at 233. Thus, the purpose of the ordinances enacted to effect these measures clearly was regulatory, with the charges being collected only to pay for the necessary regulatory actions. Because their primary purpose was regulatory, the charges imposed were properly characterized as tools of regulation rather than taxes. *Id.* at 239.

The court also found it was proper to charge all property owners within the basin regardless of any special "service" received because the authorizing statutes provided that such charges could also be based on the contribution from the fee payer's property to the increase of surface water runoff. *Id.* at 232. The County presented evidence of the methods used to determine (1) the boundaries of the Burnt Bridge Creek Utility, and (2) whether the properties included within those boundaries contributed to increased water runoff. *Id.* at 235. The County made in-field inspections to verify the direction of the flow of surface water in the basin and many on-site visits to specific properties to confirm that the water runoff actually flowed toward the creek. From maps, surveys, reports and on-site inspections the County determined that the appellant's properties contributed to the surface water runoff in the basin. *Id.* at 235. Accordingly, the court found the county had a reasonable basis to conclude there was a contribution to increased surface water runoff in the basin from the fee payer's property. *Id.* at 236.

In contrast, there are no references to how street utility charges are going to enhance the health, safety or welfare of Seattle residents in either RCW 82.80 or the city ordinances. The ordinances address only how the utility is to be created and the charges imposed. Reference to use of the funds is restricted largely to "[m]oney in the Street Utility Subfund shall be used strictly for transportation purposes." SMC § 21.100.050. Such purposes include the operation, preservation, and construction of city streets

and the development of public transportation. SMC § 21.100.010. The ordinance adds that "the Engineering Department may, in addition to funds in the Street Utility Subfund, expend other funds from other sources for street facilities and for transportation purposes." SMC § 21.100.050. RCW 82.80 expands slightly on the need to expend the funds gathered for transportation purposes, but focuses on how the street utility charges are to be imposed. RCW 82.80.070. The primary concern of these enactments is with collecting money to pay for street improvements rather than with public health, safety, or welfare. Unlike *Teter*, the regulatory purpose of the street utility charge is not self-evident.

The City also claims that its street utility charge is consistent with the charges upheld as regulatory fees in *Hillis Homes* II. At issue in *Hillis Homes* II was a general facilities charge exacted by the district on new customers wanting to connect to the district's water system. This court concluded that the district had exacted a connection charge from its new water system customers as part of an overall plan to regulate the use of water. *Hillis Homes* II, 105 Wn.2d at 299. Thus, the charges were primarily tools of regulation and not taxes.

The court also observed that the connection charges paid only for those improvements to the water system necessitated by the new customers. *Id.* at 300. Although the charges were not individualized according to the benefits accruing to each specific customer, this was not required. " '[O]nly a *practical* basis for the rates is required, not mathematical precision.' " *Id.* at 301 (quoting *Teter*, 104 Wn.2d at 238). The court cited as support for its conclusion a Florida court's description of a similar connection fee: "*The municipality seeks to shift to the user expenses incurred on his account.*" *Hillis Homes* II, 105 Wn.2d at 300 (citing *Contractors & Builders Ass'n v. Dunedin*, 329 So.2d 314, 318 (Fla. 1976)).

In comparing the charges imposed here to those imposed in *Hillis Homes* II, the City describes how the $24 and

$16.20 annual residential charges were adopted by the Seattle City Council based on the recommendations of the mayor and council staff. These recommendations were influenced, no doubt, by the $2 per month limit imposed on residential charges set forth in RCW 82.80.050. There need be no elaborate calculations here, and the Legislature provided no such justification, or "practical basis," for the $2 charge. This maximum charge in no way reflects the costs of a residential property owner's use of city streets or "the expenses incurred on his account," as did the charges in *Hillis Homes* II. The maximum monthly charge is simply a tax imposed on property owners to help raise revenue to cover preexisting costs of street maintenance and improvement.

The City also maintains that its street utility charge can be sustained as a fee rather than a tax pursuant to the analysis set forth in *King County Fire Protection Dist. 16 v. Housing Auth.*, 123 Wn.2d 819, 872 P.2d 516 (1994). At issue there was whether a housing authority could refuse to pay "benefit charges" levied by fire protection districts because the charges were taxes from which the housing authority was exempt. *Id.* at 821. The court cited *Hillis Homes* II in stating that "[i]f charges are primarily intended to raise money, they are taxes. If the charges are primarily tools of regulation, they are not taxes. Where the charge is related to a direct benefit or service, it is generally not considered a tax or assessment." *Id.* at 833. The court observed that where fire protection services were not needed by an entity that maintained its own acceptable fire protection services, benefit charges were not authorized. *Id.* at 834. The court observed further that the charges could be individually determined and the amount charged could be challenged by individual property owners. The court thus concluded that benefit charges under the fire district statute were "akin to charges for services rendered" and were not taxes. *Id.* at 834.

■ There is no way to conclude that the street utility charges are "akin to charges for services rendered." They

are not individually determined and cannot be avoided. Moreover, as discussed earlier, they are not primarily tools of regulation. Thus, they constitute taxes under the reasoning of *Fire Protection Dist.*

Finally, the City cites *Teter v. Clark County*, 104 Wn.2d 227, 704 P.2d 1171 (1985) as support for its contention that, because these moneys are placed in a segregated, special purpose fund which can be used only for a particular purpose, these moneys are fees, not taxes. *Teter*, 104 Wn.2d at 228-29. While the *Teter* court was influenced by the fact that the moneys collected were "deposited in a special fund to be used only to pay the costs of maintaining and operating storm water control facilities," the primary factor on which the court relied in determining that the charges were not taxes was that the charges were imposed within the drainage basin primarily for regulatory purposes and were properly characterized as tools of regulation, not taxes. *Id.* at 234.

■ While we agree that segregation of fees for a specific purpose is an essential ingredient in determining whether charges constitute a fee or a tax, this factor alone is not dispositive. In *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 735 P.2d 673 (1987) a Seattle ordinance required landlords who demolished low-income housing to construct replacement housing or contribute to a replacement fund if they intended to convert the property to nonresidential use. In analyzing these requirements, the court recalled the ordinance in *Hillis Homes* I that levied a park fee as a condition of plat approval:

> Because the fee was not used for the regulation of plats themselves, but was a tax to "accomplish desired public benefits which cost money . . . ", we held the ordinance was invalid. Quite simply, the municipal body cannot shift the social costs of development onto a developer under the guise of a regulation. . . .
>
>     . . . .
>
> the payment the owner must make is not being used by the

City to regulate the demolition of low-income housing units. The City is instead shifting the public responsibility of providing such housing to a limited segment of the population. This shifting is a tax . . . .

*San Telmo*, 108 Wn.2d at 24. Thus, whether the fees were placed in a separate fund and used for a specific purpose was not dispositive. Because the fees were not used to regulate the entity or activity being assessed, the court held the fees were taxes.

As demonstrated above, Seattle's street utility charge does not regulate the use of city streets by residential occupants. Instead, it transfers part of the responsibility for maintaining and constructing city streets to this limited segment of the population. While this may be part of the price a person pays to live within Seattle's city limits, it is difficult to characterize that price as a "regulatory fee." Rather, the charges authorized appear to be a new way to raise revenue to accomplish a desired public benefit—better streets.

■ A review of the applicable legislation here also supports our conclusion that Seattle's street utility charge is, in fact, a tax. As noted in *Hillis Homes* I, the characterization of charges by the governmental entity imposing them is not dispositive. Rather, the characterization of the fees turns on a determination of the primary purpose of the fees as derived from the language of the authorizing and implementing legislation. *Hillis Homes* I, 97 Wn.2d at 809.

We first look at RCW 82.80.050, which states in part that street utility charges are not to be imposed against owners of property exempt under RCW 84.36.010. This statute provides that all property belonging to the United States, as well as other governmental bodies, "*shall be exempt from taxation.*" (Emphasis added). RCW 84.36.010. Had the Legislature authorized the street utility charge as a regulatory fee, no reference to federal government exemption would have been necessary, since the United

States must pay reasonable user fees. *United States v. Huntington,* 999 F.2d 71, 73 (4th Cir. 1993), *cert. denied,* 114 S. Ct. 1048 (1994). "[C]harges for services from city-owned utilities are clearly fees for which the federal government would be liable to the same extent as any other customer." *Id.* at 73. If the service fee is a tax, however, then immunity is clear, since the states cannot tax the United States. *Id.* at 73. After setting forth these principles, the Fourth Circuit concluded in *Huntington* that the service charge at issue was in actuality a tax. *Id.* at 74. Such analysis is unnecessary here since the Legislature has already stated that entities otherwise exempt from taxation also are exempt from the street utility charge.

RCW 82.80.050 also provides that any ordinance creating a street utility must grant any business a credit against the street utility charge for any commuter or employee tax paid by that business for transportation purposes. Had the Legislature authorized the street utility charges to be imposed as fees, such a credit would have been both unnecessary and inappropriate. Instead, the Legislature quite properly provided that businesses should not be taxed twice to pay for the same purpose.

Should these statutory provisions be regarded as insufficient evidence that the Legislature authorized a street utility tax rather than a fee, there are other indicia of its intent to do so. This court has sanctioned recourse to final legislative reports as an aid in determining legislative intent. *Biggs v. Vail,* 119 Wn.2d 129, 134, 830 P.2d 350 (1992); *Brown v. Yakima,* 116 Wn.2d 556, 562, 807 P.2d 353 (1991). The 1990 Final Legislative Report describes SSB 6358 as an act "[m]odifying transportation tax rates and distributions." The summary states that "four local option transportation *taxes*" are authorized: the fuel tax, vehicle registration fees, the commercial parking tax, and the street utility charge. (Emphasis added). 1990 Final Legislative Report at 153.

The title of a legislative act also may be referred to as a

source of legislative intent. *Washington Optometric Ass'n v. County of Pierce*, 73 Wn.2d 445, 449, 438 P.2d 861 (1968); *In re Estate of Kurtzman*, 65 Wn.2d 260, 265, 396 P.2d 786 (1964). In this case, the legislation authorizing street utilities was originally described as "AN ACT Relating to transportation taxes." 1 Senate Journal at 71 (1990). Once enacted, the act was entitled "Transportation Taxes." Laws of 1990, ch. 42, at 466.

■ That the Legislature authorized street utility charges as taxes, rather than as police power measures, could not be more clear. Thus, both the authorizing legislation and the applicable case law support the conclusion that the street utility charge cannot be regarded as a regulatory fee.

We find it clear that Seattle's residential street utility charge cannot be regarded as a fee under the test derived from our cases and outlined at the outset. Here, the revenue to be collected bears no relationship to the regulation of street traffic, but is to generate funds for the nonregulatory function of repairing streets. It is clear that the primary purpose of the charge is to raise revenue. Given the absence of a regulatory purpose, it is insignificant that the funds collected are to be expended "for transportation purposes only" (a broad category indeed). This court found that depositing charges into a special fund was not enough to transform a tax into a fee in *Hillis Homes* I, and the Fourth Circuit came to the same conclusion in *Huntington*:

> Under the theory advanced by the City, virtually all of what now are considered "taxes" could be transmuted into "user fees" by the simple expedient of dividing what are generally accepted as taxes into constituent parts, e.g., a "police fee."

*Huntington*, 999 F.2d at 74. Moreover, the direct relationship between the charges and the benefits received by those who pay them is missing. This is simply a charge imposed on Seattle residents for the privilege of living within the city's limits. The street utility payments are added to a general transportation fund to provide better

service for the public at large, which includes nonresidents· who travel Seattle streets without paying the utility charge. Thus, the relationship between the charge and the benefits accruing to those paying them is tangential indeed. In short, the street utility charge fails to satisfy two of the three requirements for a valid regulatory fee and cannot be sustained as such.

▪ The City also argues, in the alternative, that its utility charge can be legitimatized as a special assessment. A special assessment is a charge imposed on property owners within a limited area to help pay the cost of a local improvement which specially benefits property within that area. 4 C. Dallas Sands, Michael Libonati, John Martinez, *Local Government Law* § 24.01, at 24-2 (1995); *see also Fire Protection Dist.*, 123 Wn.2d at 834 (special assessments are for the construction of improvements appurtenant to specific land and bring a benefit substantially more intense than is yielded to the rest of the city). There are no specific improvements described in the Seattle ordinance. The funds collected are combined with other funds to pay for street improvements all over the city. The street utility thus fails to meet the special assessment definition.

▪ Nor can the street utility charge be characterized as an excise tax, as the City also contends. This court has defined such a tax as follows:

> [T]he obligation to pay an excise is based upon the voluntary action of the person taxed in performing the act, enjoying the privilege or engaging in the occupation which is the subject of the excise, and the element of absolute and unavoidable demand, as in the case of a property tax, is lacking.

*High Tide Seafoods v. State*, 106 Wn.2d 695, 699, 725 P.2d 411 (1986), *appeal dismissed*, 479 U.S. 1073 (1987). In addition, the right to own and hold property cannot be made the subject of an excise tax, because to tax by reason of ownership of property is to tax the ownership itself. *Jensen v. Henneford*, 185 Wash. 209, 218, 53 P.2d 607 (1936); *see also* 84 C.J.S. *Taxation* § 19 at 74 (1954).

This principle was cited by a Massachusetts court in discussing whether an augmented fire services availability (AFSA) charge imposed by Boston was an excise tax. *Emerson College v. Boston*, 391 Mass. 415, 462 N.E.2d 1098 (1984). The City suggested that the charge qualified as an excise on the "privilege" of receiving an extra level of fire protection. *Id.* at 427-28. The court noted, however, that the obligation to pay an excise tax must be based on a voluntary act.

> Owners of AFSA structures are not at liberty to reject AFSA services. To the extent that payment of AFSA charges may be avoided by relinquishing ownership of buildings subject to AFSA assessments, the charges tax the privilege of owning certain improved property.

*Id.* at 428. Since the mere right to hold property cannot be the subject of an excise tax, the statute did not impose a valid excise tax. *Id.* at 428.

Here, too, Seattle residents cannot refuse to pay the street utility charge. Given Seattle's argument that the tax can be avoided by residing elsewhere, the charge must be seen as taxing the right to own certain property, as was the charge in *Emerson College*. As such, the street utility charge is not a valid excise tax.

This court has distinguished a property tax from an excise tax, defining a property tax as a tax on things tangible or intangible and an excise tax as the right to use or transfer things. *High Tide Seafoods*, 106 Wn.2d at 699. Seattle's street utility charge best fits the definition of a property tax, which is an absolute and unavoidable demand against property or the ownership of property. *Black v. State*, 67 Wn.2d 97, 99, 406 P.2d 761 (1965). Liability for the charge arises from Appellants' status as property owners and not from their use of a city service. *See Huntington*, 999 F.2d at 74.

As this court explained in *Morrow v. Henneford*, 182 Wash. 625, 47 P.2d 1016 (1935), when the tax is levied upon the exercise of only "one of the numerous rights of

property," such as the right to transfer ownership, the tax may be said to be indirect and so valid although not apportioned. *Id.* at 631. In this case, the street utility charge is not levied against the exercise of any particular right of ownership. Rather, the charge is imposed for the "use or availability of the streets." SMC § 21.100.030. The amount of the charge, however, is levied against property owners to accomplish the public benefit of improving streets.

Consequently, the street utility charge, as assessed, must be declared unconstitutional.[2] While its intentions are honorable, its manner of assessment is improper. The street utility charge is a property tax, and thus must be imposed in accordance with the requirements of law. Given our resolution of this issue, we need not discuss Appellants' other challenges to the street utility charge.

## II

We now turn to a discussion of whether Appellants are entitled to attorney fees. Appellants maintain that they are so entitled under the common fund theory and under 42 U.S.C. § 1988.

The common fund exception to the no-attorney-fees rule applies to cases where litigants preserve or create a common fund for the benefit of others as well as themselves. *Bowles v. Department of Retirement Sys.*, 121 Wn.2d 52, 70-71, 847 P.2d 440 (1993); *Public Util. Dist. 1 v. Kottsick*, 86 Wn.2d 388, 390, 545 P.2d 1 (1976). This court recently observed that the common fund rule furthers important policy interests:

> When attorney fees are available to prevailing class action plaintiffs, plaintiffs will have less difficulty obtaining counsel and greater access to the judicial system. Little good comes from a system where justice is available only to those who can afford its price.

---

[2]The Appellants' challenge here was directed at the validity of Seattle's street utility ordinances rather than toward RCW 82.80. Since the ordinances were adopted pursuant to RCW 82.80, however, the constitutionality of the street utility statutes may be called into question as well. That issue, however, is not squarely before the court in this case.

*Bowles,* 121 Wn.2d at 71.

Here, litigants Covell and Backus have sought and obtained a refund of street utility charges paid by Seattle residents. Thus, they have created a specific monetary fund *and* conferred a substantial benefit on an ascertainable class. The policy reasons for awarding attorney fees based on the common fund theory clearly are supported by authorizing such an award in this class action. Given our refusal to reach Appellants' federal law claims, however, we decline to award attorney fees pursuant to such law.

We hereby reverse the trial court's decision awarding the City summary judgment and order a refund of the residential street utility charges paid. We also award Appellants' attorney fees.

DURHAM, C.J., SMITH and JOHNSON, JJ., and ANDERSEN and BRACHTENBACH, JJ. Pro Tem., concur.

UTTER, J.* (dissenting) — While I largely agree with the majority's articulation of the law concerning the differentiation between a tax and a regulatory fee, I cannot agree with its application of that law in this case. It ignores the careful distinctions we developed in *Teter v. Clark County,* 104 Wn.2d 227, 704 P.2d 1171 (1985) and *Hillis Homes, Inc. v. Snohomish County,* 97 Wn.2d 804, 650 P.2d 193 (1982) (*Hillis Homes* I), and unnecessarily confuses this important area of law.

# I

The majority is correct in stating that whether a charge is a tax or a regulatory fee depends upon three factors:

[1] [whether] the primary purpose of the charges is to raise revenue, rather than to regulate . . . [2] whether the money collected must be allocated only to the authorized regulatory

---

*Justice Robert F. Utter is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a) (amend. 38).

purpose . . . [and] [3] whether there is a direct relationship between the fee charged and the service received by those who pay the fee or between the fee charged and the burden produced by the fee payer . . . [although the fee need not be] individualized according to the benefit accruing to each fee payer or the burden produced by the fee payer.

Majority at 879 (citations omitted). These factors, however, do not support the majority's conclusion that Seattle's street utility charge is a tax rather than a regulatory fee.

Enactments of the state Legislature concerning finances carry a strong presumption of constitutionality. Petitioners bear a heavy burden to demonstrate the contrary. *See Department of Ecology v. State Fin. Comm.*, 116 Wn.2d 246, 253, 804 P.2d 1241 (1991). The same rule applies to city ordinances. *Brown v. Yakima*, 116 Wn.2d 556, 559, 807 P.2d 353 (1991). If a state of facts justifying an ordinance can reasonably be conceived, such facts will be presumed to exist and the ordinance will be presumed to have been passed in conformity with those facts. *Silver Shores Mobile Home Park, Inc. v. Everett*, 87 Wn.2d 618, 624, 555 P.2d 993 (1976). "If possible, an enactment must be interpreted in a manner which upholds its constitutionality." *Tacoma v. Luvene*, 118 Wn.2d 826, 841, 827 P.2d 1374 (1992) (citing *State v. Dixon*, 78 Wn.2d 796, 804, 479 P.2d 931 (1971)). Thus, the analysis in this case must begin with a presumption that Seattle's street utility charge is constitutional, that is, a presumption that the charge is a regulatory fee rather than a tax.

In evaluating whether a charge is a tax or a fee, we are not limited to the language of the ordinance or statute only. To assess whether the charge is imposed pursuant to a regulatory scheme, we may look to the context in which the legislation operates. *Margola Assocs. v. Seattle*, 121 Wn.2d 625, 637-38, 854 P.2d 23 (1993).

The charges at issue in this case bear one of the hallmarks of regulatory fees because they are manifestly imposed pursuant to a regulatory scheme. The City is authorized to use the moneys collected only after extensive

planning and development of a specific transportation program, which includes fiscal planning and coordination with the local and regional land use plans, and after considering the effects of anticipated growth in the planning area. RCW 82.80.070. Moreover, the moneys collected may be used only to advance that regulatory purpose and may not be diverted into the general treasury.

(2) The local option transportation revenues shall be expended for transportation uses *consistent with the adopted transportation and land use plans* of the jurisdiction expending the funds and *consistent with any applicable and adopted regional transportation plan for metropolitan planning areas.*

(3) Each local government with a population greater than eight thousand that levies or expends local option transportation funds, is also *required to develop and adopt a specific transportation program . . .*

RCW 82.80.070 (emphasis added). With respect to use of revenues, the statute specifies:

(1) The *proceeds collected* pursuant to the exercise of the local option authority of RCW 82.80.010, 82.80.020, 82.80.030, and 82.80.050 (hereafter called "local option transportation revenues") *shall be used for transportation purposes only,* including but not limited to the following: The operation and preservation of roads, streets, and other transportation improvements; new construction, reconstruction, and expansion of city streets, county roads, and state highways and other transportation improvements; development and implementation of public transportation and high-capacity transit improvements and programs; and planning, design, and acquisition of right of way and sites for such transportation purposes.

RCW 82.80.070 (emphasis added); *see also* RCW 82.80.050.

The majority relies on *Hillis Homes* I in support of its conclusion that the charges at issue are taxes rather than regulatory fees. That case, however, bears only a superficial similarity to this case, insofar as the charges imposed there, as here, raised monies which ultimately inured to

the public benefit. In *Hillis Homes* I, county ordinances required developers to pay for general public services such as waste disposal, road paving, fire protection, schools and sheriff's services. Although the fees collected were to be deposited in a special fund, this court concluded the fees were taxes because the ordinances authorizing the fees were not regulatory in nature; they did not seek to use the fees to regulate the subdivisions. *Hillis Homes* I, 97 Wn.2d at 810. The majority's attempt to liken *Hillis Homes* I to the case at bar is ultimately unavailing because the charges were not imposed primarily to further a general regulatory scheme.

The case before us bears a closer resemblance to two cases in which we concluded the charge at issue was regulatory, *Teter* and *Hillis Homes, Inc. v. Public Util. Dist. 1*, 105 Wn.2d 288, 714 P.2d 1163 (1986) (*Hillis Homes* II). In *Teter*, a county and city created a storm and surface water department to handle drainage in a particular basin. Acting pursuant to state law, they then imposed charges on owners of the property lying within the drainage basin to fund maintenance and operation of storm water control facilities, such as runoff and erosion control and septic tank regulation. *Teter*, 104 Wn.2d at 239. The charge was challenged as an unconstitutional tax by property owners who maintained their properties did not receive any special benefit. *Teter*, 104 Wn.2d at 228. Although the appellants received no "specific" service, we held the charges were regulatory fees which could properly be imposed under the police power. *Teter*, 104 Wn.2d at 233-34.

In *Teter*, we treated the storm water systems in the same way as garbage and sewer charges, permitting a government to impose upon a property owner his allocable share of the cost of a public surface water system established to handle runoff from his and others' land. We deemed the payments "tools of regulation" rather than taxes, because they were designed to offset the public costs associated with private activity. *See Teter*, 104 Wn.2d at 238-39. We

explained further that the storm water charges were proper so long as they reflected the user's allocable share of the costs of the program and were used solely for the costs of that program. *Teter*, 104 Wn.2d at 233-34. It was, moreover, proper to charge all property that contributed to surface water runoff regardless of any "special," particularized benefit received. *See Teter*, 104 Wn.2d at 234, 238.

The *Teter* opinion also contains some very broad language concerning the scope of the police power under which the city and/or the county may impose a charge. The court stated:

> The police power is broad enough to encompass all laws tending to promote the "health, peace, morals, education, good order and welfare of the people. . . . [T]he only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state . . ."

*Teter*, 104 Wn.2d at 233 (quoting *Markham Advertising Co. v. State*, 73 Wn.2d 405, 421-22, 439 P.2d 248 (1968)). The only restriction we placed on the ability to impose a fee pursuant to that police power is that the charge must be primarily a tool of regulation.

The majority's attempt to distinguish *Teter* from the present case is not persuasive. The majority states in regard to the statutes authorizing and implementing Seattle's street utility charge:

> The primary concern of these enactments is with collecting money to pay for street improvements rather than with public health, safety, or welfare. Unlike *Teter*, the regulatory purpose of the street utility charge is not self-evident.

Majority at 883. On the contrary, it seems quite self-evident that the improvement of city streets is very closely connected to public safety and welfare. At the very least, it "reasonably tend[s] to correct some evil or promote some interest of the state," as is required by *Teter*.

In *Hillis Homes* II, we applied the reasoning of *Teter* to

uphold a charge imposed on new customers to raise revenues to pay for systemwide capital improvements to a water system. The charges in that case were calibrated according to the expected water demand of each class of customer: single-family, multi-family, and commercial/ industrial. We reaffirmed the notion articulated in *Teter* that there need not be a special, in the sense of individualized, benefit before a regulatory fee could be imposed. Different classes of customers could be charged different rates as long as the classifications themselves were reasonable. " '[O]nly a *practical* basis for the rates is required, not mathematical precision.' " *Hillis Homes* II, 105 Wn.2d at 301 (quoting *Teter*, 104 Wn.2d at 238).

The categories of charges imposed on residences in this case were adopted by the city council based on the recommendations of the mayor and council staff using criteria authorized in RCW 82.80.050, including "[t]he difference in cost of service to the various users or traffic generators; [and the] location of the various users or traffic generators within the city or town . . . ." RCW 82.80.050. The recommendations for residential rates were the result of trip generation statistics and other materials compiled by the department of engineering. The department concluded from the available data that the average number of vehicle trips generated each day by single-family residences differed from the number generated by multi-family (apartment) residences. *See generally* Clerk's Papers at 10-120 (Decl. of Mark Anthony); Clerk's Papers at 128-31 (Decl. of Martha Lester). Duplexes were categorized with single-family residences because they were found to generate more vehicle trips than multi-family apartments. Clerk's Papers at 128-31.

The relationship between the fee payer and the burden produced by the fee payer is made even stronger in this case by a nexus of necessity. It is necessary for residents to use the city streets in order to get to their homes. The fact that other people will inevitably use the streets is simply an attribute of public streets.

Because the charges here bear the indicia of user charges as described in *Teter* and *Hillis Homes* II, they should be seen as valid user fees imposed under the City's police power. The charges are not taxes because they are imposed pursuant to a regulatory scheme which operates the street utility; they generate funds which are allocated to that purpose alone; and since they are designed to offset the proportionate share of impact on the streets caused by residents of and visitors to housing, there is a direct, although not particularized, relationship between the rate burden and the burden on the streets produced by those who pay the rates.[3] *See* RCW 82.80.050.

## II

I must also take issue with the majority's discussion of legislative intent. This portion of the majority's opinion is unnecessary and not consistent with this court's prior decisions.

First, the majority notes that RCW 82.80.050 (the statute authorizing street utility charges) provides that such charges are not to be imposed against owners of property exempt under RCW 84.36.010—a statute which exempts property belonging to the United States and other governmental bodies from taxation. Majority at 886. The majority then concludes that "[h]ad the Legislature authorized the street utility charge as a regulatory fee, no reference to federal government exemption would have been necessary, since the United States must pay reasonable

---

[3]Unlike the charges at issue in this case, a tax bears no necessary connection between the person who bears the burden and how or for whose benefit the moneys collected are spent. *Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 33-34, 211 P.2d 651 (1949), *rev'd on other grounds by Washington State Fin. Comm'n v. Martin*, 62 Wn.2d 645, 211 P.2d 651 (1963). "Taxes are the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government and for all public needs." 1 Thomas M. Cooley, *Taxation* § 1 at 61 (4th ed. 1924); *see State ex rel. Nettleton v. Case*, 39 Wash. 177, 182, 81 P. 554 (1905) ("Taxes are defined to be 'burdens or charges imposed by legislative authority on persons or property, to raise money for public purposes, or, more briefly, "an imposition for the supply of the public treasury." ' ")) (quoting *American and English Encyclopedia of Law* 578 (2d ed. 1905)); *see also Hillis Homes* I, 97 Wn.2d at 809.

user fees." Majority at 886-87 (citing *United States v. Huntington*, 999 F.2d 71, 73 (4th Cir. 1993), *cert. denied*, 510 U.S. 1109, 114 S. Ct. 1048 (1994)). On the contrary, an equally likely interpretation of this provision is that, had the Legislature authorized the street utility charge as a *tax*, no reference to the federal government exemption would have been necessary, since it would merely have been redundant. It is entirely possible that the Legislature wished to exempt property owned by the federal government from a regulatory fee, even though it could have imposed it upon the United States if it wished.

Next, the majority states:

> RCW 82.80.050 also provides that any ordinance creating a street utility must grant any business a credit against the street utility charge for any commuter or employee tax paid by that business for transportation purposes. Had the Legislature authorized the street utility charges to be imposed as fees, such a credit would have been both unnecessary and inappropriate. Instead, the Legislature quite properly provided that businesses should not be taxed twice to pay for the same purpose.

Majority at 887. Again, it is entirely possible that the Legislature wished to grant an exemption where it was not constitutionally compelled to do so. The majority does not explain why such an exemption would be "inappropriate," especially in light of the fact that the very same exemption is "quite proper" if the charge is merely characterized as a tax rather than a fee.

The majority then goes on to discuss the titles given to the legislative reports and the final act which contained the authorization for the street utility charges. The fact that the title of an act or a legislative report, which contained provisions for a number of different charges relating to transportation, referred to taxes cannot be dispositive or, in this case, persuasive. The titles referred to by the majority are short and simple descriptions of the content of the act or report. They are obviously not concerned with the articulation of fine legal distinctions.

Additionally, the majority, in support of its conclusion, notes that the summary in the 1990 Final Legislative Report "states that 'four local option transportation *taxes*' are authorized: the fuel tax, vehicle registration fees, the commercial parking tax, and the street utility charge." Majority at 887 (citing 1990 Final Legislative Report at 153). This summary, however, does not support the majority's argument. The majority provides no evidence that the other three charges authorized by the act are taxes rather than regulatory fees. Thus, it is likely that the term "tax" was used over-inclusively to refer to taxes, fees, and other charges.

Finally, as the majority acknowledges elsewhere in its opinion, this court very clearly decided in *Hillis Homes* I that the characterization of a charge as a fee or a tax by a government entity is not dispositive. In that case, the counties characterized the charges as fees, but after examining the purpose of the charges, this court determined that they were in fact taxes. *See Hillis Homes* I, 97 Wn.2d at 808; *see also* Majority at 880, 885-86.

Whether the Legislature intended the street utility charges to be taxes or fees is obscure. The majority greatly overstates its case when it claims: "That the Legislature authorized street utility charges as taxes, rather than as police power measures, could not be more clear." Majority at 888. Moreover, as this court found in *Hillis Homes* I, the characterization of a charge by a governmental entity is largely irrelevant in this context. If it were otherwise, any governmental entity could insulate any charge from the constitutional requirement of tax uniformity merely by calling it a fee.

Governments must be allowed to govern. The Legislature intended to give local governments broad authority to assess street utility charges, and local authorities must be allowed some flexibility in their efforts to implement these fees.

Seattle's street utility charges meet the criteria for a regulatory fee that this court has established in prior

cases. I therefore would affirm the trial court's summary judgment upholding the validity of Seattle's street utility charge.[4]

DOLLIVER and GUY, JJ., concur with UTTER, J. Pro Tem.

Reconsideration denied March 12, 1996.

---

[4]Because only "successful" litigants are entitled to an award of attorney fees, *see Leischner v. Alldridge*, 114 Wn.2d 753, 756-57, 790 P.2d 1234 (1990), and even then, only if there is an immediate common fund from which attorney fees can be drawn, *Miotke v. Spokane*, 101 Wn.2d 307, 339, 678 P.2d 803 (1984), I would also deny Petitioners such fees.